**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

JENNIFER N. PRINE                                                    CIVIL ACTION

VERSUS

23-25-SDD-SDJ

LOXDON INSURANCE COMPANY, ET AL

## RULING

This is a personal injury case that arises out of an automobile collision. Plaintiff Jennifer Prine ("Prine") filed suit against Defendants Loxdon Insurance Company Inc., A Risk Retention Group ("Loxdon"), Global Transportation LLC ("Global Transportation"), and Bekiev Maksat ("Maksat"), (collectively, "Defendants") on December 6, 2022.[1] The matter came before the Court for a bench trial on August 26, 2025.[2]

Defendants stipulate to liability.[3] They conceded that Maksat drove the truck and trailer (the "18-wheeler") that caused the automobile collision.[4] Maksat did so for the benefit of and as an employee of Global Transportation, which is insured by Loxdon.[5] The only issues for trial were the cause of Prine's injuries and the measurement of damages incurred.[6]

The Court has considered the Parties' pre-trial submissions, the evidence admitted at trial via documents and sworn testimony, the expert trial depositions, and the

---

[1] Rec. Doc. 1-4.
[2] Rec. Doc. 33.
[3] Rec. Doc. 28, p. 1.
[4] *Id.*
[5] *Id.*
[6] Rec. Doc. 20, ¶ 10; Rec. Doc. 21, ¶ 7.

arguments presented. The Court finds that judgment will be entered in favor of Plaintiff and against Defendants, in solido, in the sum of $859,325.72.

**I.    STIPULATIONS OF FACT**

Prior to trial, the parties submitted draft Findings of Fact and Conclusions of Law.[7] The parties' proposed Findings of Fact are largely the same, and thus, the Court treats those agreed upon facts as stipulations of fact.

**A.  Jurisdiction**

1.    Prine is of the age of majority and is a natural born citizen of the United States.[8] She is a domiciliary of Livingston Parish, Louisiana.[9]

2.    Loxdon is a liability insurance carrier domiciled outside the State of Louisiana.[10]

3.    Global Transportation is a limited liability company domiciled outside the State of Louisiana.[11]

4.    Maksat is an employee of Global Transportation domiciled outside the State of Louisiana.[12]

5.    The amount in controversy exceeds $75,000, exclusive of interest and cost.[13]

**B.  Procedural History**

6.    Prine filed her Petition for Damages in the 21st Judicial District Court, Parish of Livingston, Louisiana, on December 6, 2022.[14]

---

[7] Rec. Docs. 20, 21.
[8] Rec. Doc. 20, ¶ 1; Rec. Doc. 21, ¶ 1.
[9] Rec. Doc. 20, ¶ 1; Rec. Doc. 21, ¶ 1.
[10] Rec. Doc. 20, ¶ 2; Rec. Doc. 21, ¶ 2.
[11] Rec. Doc. 20, ¶ 2; Rec. Doc. 21, ¶ 2.
[12] Rec. Doc. 20, ¶ 2; Rec. Doc. 21, ¶ 2.
[13] Rec. Doc. 20, ¶ 3; Rec. Doc. 21, ¶ 3.
[14] Rec. Doc. 20, ¶ 4; Rec. Doc. 21, ¶ 9.

7.  Defendants removed the case to the United States District Court for the Middle District of Louisiana.[15]

8.  Defendants filed an Answer on January 24, 2023.[16]

### C. The Collision

9.  On December 28, 2021, around 9:55 a.m., Prine was driving her 2004 GMV Envoy eastbound on I-12.[17] She was traveling from her home in Walker, Louisiana, to her place of employment, NorthOaks Hospital ("NorthOaks"), in Hamond, Louisiana.[18] The collision occurred about 3.8 miles east of the Walker exit.[19]

### D. Injuries and Medical Treatment

10. Prine's then fiancé, and now husband, Scott Jones ("Jones") drove her to Baton Rouge General in Baton Rouge, Louisiana, following the collision.[20] Prine reported neck pain, left hand pain, upper back pain, and bilaterial knee pain.[21] X-rays were taken of her left hand, left knee, and thoracic spine.[22] A cervical spine CT was taken as well.[23] She was administered Norflex, Ketorolac, and Tenivac.[24] She was prescribed Didiofenac Potassium for pain and Methocarbomol for muscle spasms.[25]

---

[15] Rec. Doc. 20, ¶ 5; Rec. Doc. 21, ¶ 10.
[16] Rec. Doc. 20, ¶ 6; Rec. Doc. 21, ¶ 11.
[17] Rec. Doc. 20, ¶ 12; Rec. Doc. 21, ¶ 12.
[18] Rec. Doc. 20, ¶ 12; Rec. Doc. 21, ¶ 12.
[19] Rec. Doc. 20, ¶ 12; Rec. Doc. 21, ¶ 12.
[20] Rec. Doc. 20, ¶ 18; Rec. Doc. 21, ¶ 14.
[21] Rec. Doc. 20, ¶ 18; Rec. Doc. 21, ¶ 14.
[22] Rec. Doc. 20, ¶ 18; Rec. Doc. 21, ¶ 14.
[23] Rec. Doc. 20, ¶ 18; Rec. Doc. 21, ¶ 14.
[24] Rec. Doc. 20, ¶ 18; Rec. Doc. 21, ¶ 14.
[25] Rec. Doc. 20, ¶ 18; Rec. Doc. 21, ¶ 14.

11.     Prine sought treatment with Dr. Thad Broussard ("Dr. Broussard").[26] Dr. Broussard

is now retired.[27] Counsel was unable to obtain records related to Prine's treatment

with Dr. Broussard.[28]

12.     Dr. Broussard performed one injection.[29] The parties speculate that this was likely

an in-office Toradol injection.[30] He referred Prine to Moreau Physical Therapy on

January 18, 2022.[31] The written referral from Dr. Broussard's office notes that his

diagnosis was "Cervical / Lumbar Sprain."[32]

13.     Prine regularly treated with Moreau Physical Therapy from January 25, 2022,

through May 11, 2022, a total of 11 treatments.[33]

14.     Dr. Broussard also referred Prine for a cervical MRI.[34] Prine had the MRI on

February 9, 2022.[35] The MRI revealed the following:

- C3-C4: disc bulge extends 1 to 2 mm beyond the margin of the vertebral column mild narrowing of the left foramen.

- C4-C5: circumferential disc bulge extends 2 mm beyond the margin of the vertebral column. Mild facet arthropathy and some uncovertabral spurring cause mild narrowing of both foramen.

- C5-C6: Mild narrowing of the disk. Circumferential disc bulge extends 2 mm beyond the posterior margin of the vertebral column. Mild facet arthropathy and some unconvertebral spurring cause mild narrowing of the right foreman and moderate narrowing of the left foreman.

---

[26] Rec. Doc. 20, ¶ 19; Rec. Doc. 21, ¶ 15.
[27] Rec. Doc. 20, ¶ 19; Rec. Doc. 21, ¶ 15.
[28] Rec. Doc. 20, ¶ 19; Rec. Doc. 21, ¶ 15.
[29] Rec. Doc. 20, ¶ 20; Rec. Doc. 21, ¶ 16.
[30] Rec. Doc. 20, ¶ 20; Rec. Doc. 21, ¶ 16.
[31] Rec. Doc. 20, ¶ 20; Rec. Doc. 21, ¶ 16.
[32] Rec. Doc. 20, ¶ 20; Rec. Doc. 21, ¶ 16.
[33] Rec. Doc. 20, ¶ 23; Rec. Doc. 21, ¶ 18.
[34] Rec. Doc. 20, ¶ 22; Rec. Doc. 21, ¶ 17.
[35] Rec. Doc. 20, ¶ 22; Rec. Doc. 21, ¶ 17.

- C6-C7: disc bulge extends 1 mm beyond the margin of the vertebral column.[36]

15. Prine went to Dr. Chambliss Harrod ("Dr. Harrod") at the Bone and Joint Clinic on October 17, 2022.[37]

16. Dr. Harrod recommended a cervical Epidural Steroid Injection ("ESI"), a CT myelogram of the cervical spine.[38] He determined that Prine was a candidate for a right upper Electromyography and Nerve Conduction Study as well, if no better.[39] Dr. Harrod referred Prine to Dr. Mark John ("Dr. John"), an interventional pain management physician.[40]

17. Prine presented to Dr. John on November 2, 2022.[41]

18. Dr. John recommended a right C7-T1 ESI.[42]

19. Prine underwent a right C7-T1 ESI on December 13, 2022.[43] Dr. John performed the procedure.[44]

20. Prine underwent a Cervical Medial Branch Block at the Right Third Occipital Nerve, as well as Right C3, C4, C5, and C6 Branch Blocks.[45] She reported 80% pain relief.[46] Dr. John ordered a repeat Cervical Medial Branch Block at the Right Third Occipital Nerve, as well as Right C3, C4, C5, and C6 Branch Blocks.[47]

---

[36] Rec. Doc. 20, ¶ 22; Rec. Doc. 21, ¶ 17.
[37] Rec. Doc. 20, ¶ 24; Rec. Doc. 21, ¶ 19.
[38] Rec. Doc. 20, ¶ 25; Rec. Doc. 21, ¶ 20.
[39] Rec. Doc. 20, ¶ 25; Rec. Doc. 21, ¶ 20.
[40] Rec. Doc. 20, ¶ 25; Rec. Doc. 21, ¶ 20.
[41] Rec. Doc. 20, ¶ 26; Rec. Doc. 21, ¶ 21.
[42] Rec. Doc. 20, ¶ 27; Rec. Doc. 21, ¶ 22.
[43] Rec. Doc. 20, ¶ 28; Rec. Doc. 21, ¶ 23.
[44] Rec. Doc. 20, ¶ 28; Rec. Doc. 21, ¶ 23.
[45] Rec. Doc. 20, ¶ 31; Rec. Doc. 21, ¶ 24.
[46] Rec. Doc. 20, ¶ 31; Rec. Doc. 21, ¶ 24.
[47] Rec. Doc. 20, ¶ 31; Rec. Doc. 21, ¶ 24.

21.    On March 13, 2023, Prine underwent an Electromyography and Nerve Conduction Study conducted by Dr. Gregory Ward ("Dr. Ward") with the Louisiana Institute of Physical Medicine.[48]

22.    On March 22, 2023, Prine repeated the Cervical Medial Branch Blocks at the Right Third Occipital Nerve, as well as Right C3, C4, C5, and C6 Branch Blocks.[49]

23.    On May 3, 2023, Prine underwent a radiofrequency ablation to the Right Third Occipital Nerve, as well as a radiofrequency ablation to the Right C3, C4, C5, and C6 Medial Branches.[50]

24.    Prine began treating with Dr. Ronald McMorris, DC ("Dr. McMorris") on October 23, 2023, at Elite Livingston.[51] Her chief complaint was right-sided neck pain.[52] She treated with Dr. McMorris 20 times through March 2024.[53]

25.    Prine underwent a repeated cervical MRI on January 3, 2024.[54] It revealed no change since her February 9, 2022 cervical MRI.[55]

26.    Prine underwent a right shoulder MRI on January 17, 2024.[56] The MRI revealed ill-defined tears and degeneration involving the posterior labrum.[57]

27.    On January 29, 2024, Prine went to Dr. Ricardo Rodriguez ("Dr. Rodriguez") at Baton Rouge Orthopaedic Clinic.[58] Dr. Rodriguez personally reviewed the right

---

[48] Rec. Doc. 20, ¶ 32; Rec. Doc. 21, ¶ 25.
[49] Rec. Doc. 20, ¶ 33; Rec. Doc. 21, ¶ 26.
[50] Rec. Doc. 20, ¶ 34; Rec. Doc. 21, ¶ 27.
[51] Rec. Doc. 20, ¶ 39; Rec. Doc. 21, ¶ 28.
[52] Rec. Doc. 20, ¶ 39; Rec. Doc. 21, ¶ 28.
[53] Rec. Doc. 20, ¶ 39; Rec. Doc. 21, ¶ 28.
[54] Rec. Doc. 20, ¶ 42; Rec. Doc. 21, ¶ 29.
[55] Rec. Doc. 20, ¶ 42; Rec. Doc. 21, ¶ 29.
[56] Rec. Doc. 20, ¶ 43; Rec. Doc. 21, ¶ 30.
[57] Rec. Doc. 20, ¶ 43; Rec. Doc. 21, ¶ 30.
[58] Rec. Doc. 20, ¶ 44; Rec. Doc. 21, ¶ 31.

shoulder MRI and noted thinning and irregularity of the posterior labrum/posterior labral tear.[59]

28.    Dr. Rodriguez also performed a right should injection on January 29, 2024.[60] The injection consisted of 6 mg of Celestone and 30 mg of Xylocain.[61] Dr. Rodriguez ordered physical therapy for the right shoulder and to return in 6 weeks.[62]

29.    On February 14, 2024, Prine returned to Moreau PT and continued treating there through February 29, 2024.[63]

30.    Dr. John referred Prine to Dr. Kevin Callerame ("Dr. Callerame") with Our Lady of the Lake Physicians Group Neurology.[64] Prine saw Dr. Callerame on February 28, 2024.[65] Dr. Callerame performed a neurological examination concluding that the right occipital neuralgia could be related to both the cervical spondylosis as well as the shoulder labral tear.[66] He ordered an EMG/Nerve Conduction Study for Prine's upper extremities.[67]

31.    Prine returned to Dr. Rodriguez on March 13, 2024, for continued right shoulder and neck pain.[68] Dr. Rodriguez performed a physical examination and recommended a right shoulder posterior labral repair surgery.[69]

---

[59] Rec. Doc. 20, ¶ 44; Rec. Doc. 21, ¶ 31.
[60] Rec. Doc. 20, ¶ 45; Rec. Doc. 21, ¶ 32.
[61] Rec. Doc. 20, ¶ 45; Rec. Doc. 21, ¶ 32.
[62] Rec. Doc. 20, ¶ 45; Rec. Doc. 21, ¶ 32.
[63] Rec. Doc. 20, ¶ 46; Rec. Doc. 21, ¶ 33.
[64] Rec. Doc. 20, ¶ 47; Rec. Doc. 21, ¶ 34.
[65] Rec. Doc. 20, ¶ 47; Rec. Doc. 21, ¶ 34.
[66] Rec. Doc. 20, ¶ 47; Rec. Doc. 21, ¶ 34.
[67] Rec. Doc. 20, ¶ 47; Rec. Doc. 21, ¶ 34.
[68] Rec. Doc. 20, ¶ 48; Rec. Doc. 21, ¶ 35.
[69] Rec. Doc. 20, ¶ 48; Rec. Doc. 21, ¶ 35.

32.    Dr. Rodriguez performed an arthroscopic right shoulder posterior labral repair on April 25, 2024.[70]

33.    Prine returned to Dr. Rodriguez on May 22, 2024, and reported that she was feeling better.[71] Dr. Rodriguez ordered that Prine begin post-surgery physical therapy for her right shoulder.[72]

34.    Prine began physical therapy at Peak Performance Physical Therapy on June 11, 2024.[73] She treated at Peak Performance Physical Therapy through October 3, 2024, for a total of 22 treatment dates.[74]

35.    On July 1, 2024, Dr. Callerame performed an EMG/Nerve Conduction Study of Prine's upper extremities.[75]

36.    Prine returned to Dr. John on June 22, 2025.[76] Dr. John recommended a repeat of the radiofrequency ablation Right Third Occipital Nerve as well as radiofrequency ablation to the Right C3, C4, C5, and C6 Medial Branches.[77]

   **E.  Past Lost Wages**

37.    At the time of the collision, Prine worked at NorthOaks as a Medical Lab Tech.[78]

---

[70] Rec. Doc. 20, ¶ 49; Rec. Doc. 21, ¶ 36.
[71] Rec. Doc. 20, ¶ 51; Rec. Doc. 21, ¶ 37.
[72] Rec. Doc. 20, ¶ 51; Rec. Doc. 21, ¶ 37.
[73] Rec. Doc. 20, ¶ 52; Rec. Doc. 21, ¶ 38.
[74] Rec. Doc. 20, ¶ 52; Rec. Doc. 21, ¶ 38.
[75] Rec. Doc. 20, ¶ 53; Rec. Doc. 21, ¶ 39.
[76] Rec. Doc. 20, ¶ 54; Rec. Doc. 21, ¶ 40.
[77] Rec. Doc. 20, ¶ 54; Rec. Doc. 21, ¶ 40.
[78] Rec. Doc. 20, ¶ 70; Rec. Doc. 21, ¶ 55.

## II.    FINDINGS OF FACT

### A.  The Collision

38.    On December 28, 2021, Prine was traveling in the far-left lane on I-12. Maksat's 18-wheeler was in the middle lane.[79]

39.    Maksat's 18-wheeler merged into the far-left lane and hit Prine's vehicle on the front passenger side.[80]

40.    The impact of the collision pushed Prine's vehicle into I-12's concrete barrier.[81] Prine's vehicle then bounced off the concrete barrier and hit Maksat's 18-wheeler.[82] Prine's vehicle attached to the 18-wheeler, which then drug Prine's vehicle down I-12 "for a little ways."[83] When Prine's vehicle unattached from the 18-wheeler, it spun around and hit I-12's concrete barrier head-on.[84]

41.    The airbags in Prine's vehicle deployed.[85]

42.    Prine's vehicle was significantly damaged.[86]

43.    State Police, Jones, a fire truck, and an ambulance responded to the scene.[87]

44.    EMS personal examined Prine and offered to take her to Ochsner Hospital on O'Neal Lane.[88] Prine asked that Jones take her to Baton Rouge General instead.[89]

45.    Prine was 36 years old on the date of the collision.[90]

---

[79] Trial Transcript, p. 11, lines 5–15.
[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] *Id.*
[84] *Id.*
[85] *Id.* at p. 16, lines 16–17.
[86] *Id.* at p. 15, lines 2–21; p. 16, lines 1–25.
[87] *Id.* at p. 17, lines 9–10.
[88] *Id.* at p. 17, lines 13–19.
[89] *Id.*
[90] *Id.* at p. 61, lines 12–13.

**B. Injuries and Medical Treatment**

46. Prine began physical therapy with Moreau Physical Therapy on January 25, 2022, for left sided neck and shoulder pain.[91] Prine complained of constant aching in her left upper trap and between her spine and scapula beginning after the motor vehicle accident.[92] Prine specifically noted that when she performs overhead tasks or prolonged upper extremity activities, like washing her hair or typing at the computer, she experiences left upper extremity tingling and numbness in her left hand.[93] She also reported her left cervical spine pain to be 6/10 at its best and 8/10 at its worst.[94]

47. Prine's chief complaints to Dr. Harrod on October 17, 2022, were neck, right shoulder, and upper back pain following the motor vehicle accident.[95] She reported pain on her right side greater than her left, 8/10; worsening pain during sleep, driving, and prolonged activities; and numbness and tingling in her right hand that was greater than her left.[96] She also noted that her pain was primarily to her neck, bilateral shoulders, and her arm to hand.[97]

48. When Prine presented to Dr. John on November 2, 2022, she described her pain as a 6/10 and constant but with variable intensity.[98] Dr. John's notes reflect that Prine's pain radiates into her right upper extremity more than her left upper extremity.[99] Dr. John's notes further reflect that factors that aggravated Prine's pain

---

[91] Pl. Ex. 17, p. 64.
[92] Id.
[93] Id.
[94] Id.
[95] Pl. Ex. 19, pp. 6, 11.
[96] Id. at p. 11.
[97] Id.
[98] Pl. Ex. 20, p. 2.
[99] Id.

include sitting, turning her head, looking in a microscope, holding and using her phone for a long period of time, and sleeping.[100] Dr. John performed a physical examination and found positive findings upon palpation of Prine's right trapezius.[101]

49.    Prine returned to Dr. John on December 28, 2022, because she did not receive relief from the December 13, 2022 right C7-T1 ESI.[102]

50.    Prine suffered a miscarriage in January 2023.[103]

51.    On February 15, 2023, Dr. John recommended that Prine undergo an Electromyography and Nerve Conduction Study.[104]

52.    On February 22, 2023, Dr. John performed a Cervical Medial Branch Blocks at Right Third Occipital Nerve on Prine, as well as Right C3, C4, C5 and C6 Branch Blocks.[105]

53.    Dr. Ward performed an Electromyography and Nerve Conduction Study on March 13, 2023.[106] Dr. Ward concluded that there was evidence of moderate acute C5 and C6 radiculopathy on the right and left, mainly affecting the C6 nerve root.[107] He also concluded that Prine had moderate bilateral carpel tunnel syndrome.[108]

54.    Prine reported 80% relief following her second Cervical Medial Branch Blocks at Right Third Occipital Nerve, as well as Right C3, C4, C5 and C6 Branch Blocks on

---

[100] *Id.*
[101] *Id.* at p. 3.
[102] *Id.* at p. 8.
[103] Trial Transcript, p. 31, lines 16–22.
[104] Pl. Ex. 20, p. 13.
[105] Pl. Ex. 21, p. 15.
[106] Pl. Ex. 22, p. 2.
[107] *Id.* at p. 5.
[108] *Id.*

March 22, 2023.[109] Dr. John recommended the radiofrequency ablation he performed on May 3, 2023.[110]

55.    On May 17, 2023, Prine reported that the radiofrequency ablation provided 60% relief but that she was experiencing some occipital pain.[111] Dr. John performed an in-office occipital lidocaine injection.[112]

56.    On May 31, 2023, Prine reported that the radiofrequency ablation provided 70% relief with full range of motion to the right.[113] Dr. John prescribed her Neurontin and increased her dosage of Elavil.[114]

57.    On June 28, 2023, Prine continued to experience 70% relief following the radiofrequency ablation.[115] Dr. John's notes reflect that Prine had tenderness to palpation over the occipital area.[116] Dr. John increased Prine's dosage of Elavil.[117]

58.    On August 2, 2023, Prine was still at 70% relief following the radiofrequency ablation.[118] Her pain level was a 6/10.[119] Prine requested a referral to a neurologist.[120]

59.    On December 6, 2023, Prine was experiencing 5/10 pain and continued dysesthesias over her right scalp.[121] Dr. John noted persistent cervical pain and headaches despite the radiofrequency ablation.[122]

---

[109] Pl. Ex. 20, p. 17.
[110] *Id.* at p. 18.
[111] *Id.* at p. 22.
[112] *Id.*
[113] *Id.* at p. 24.
[114] *Id.* at p. 25.
[115] *Id.* at p. 26.
[116] *Id.*
[117] *Id.* at p. 27.
[118] *Id.* at p. 29.
[119] *Id.*
[120] *Id.*
[121] *Id.* at p. 31.
[122] *Id.* at p. 32.

60.     Prine underwent a right elbow MRI on January 17, 2024, which revealed a joint effusion.[123]

61.     On January 25, 2024, Dr. McMorris recommended that Prine see an orthopedic physician for right shoulder treatment.[124]

62.     When Prine presented to her orthopedic physician Dr. Rodriguez, she expressed trouble with her right shoulder for approximately two years.[125]

63.     Prine returned to Dr. Rodriguez on May 2, 2024, and reported that she was still experiencing some pain.[126] Dr. Rodriguez recommended hand and elbow exercises, shoulder shrugs, and that Prine return in 3 weeks.[127]

64.     Dr. Callerame conducted an EMG/ Nerve Conduction Study on July 1, 2024, which revealed right ulnar neuropathy at Prine's elbow.[128]

65.     When Prine returned to Dr. John on June 20, 2025, she expressed a return of right cervical pain into the right trapezius.[129] Prine's pain level was a 6/10.[130] Dr. John performed a physical examination and noted positive findings relative to the right facet joints.[131]

66.     Dr. John scheduled Prine for a repeated radiofrequency ablation on September 17, 2025.[132]

---

[123] Pl. Ex. 23, p. 24.
[124] Trial Transcript, p. 129, lines 9–25; p. 130, lines 1–10.
[125] Pl. Ex. 24, p. 8.
[126] *Id.* at p. 6.
[127] *Id.*
[128] Pl. Ex. 26, p. 13.
[129] Pl. Ex. 20, p. 36.
[130] *Id.*
[131] *Id.* at 37.
[132] *Id. See also* Trial Transcript, p. 55, lines 2–16.

### C. Past Medical Expenses

67.    Prine was billed the following amounts from the following providers:

| | |
|---|---|
| Baton Rouge General | $ 4,541.05[133] |
| Moreau Physical Therapy | $ 4,283.00[134] |
| Imaging Center of Louisiana | $ 7,150.00[135] |
| Bone & Joint Clinic of Baton Rouge | $ 679.00[136] |
| Interventional Spine & Rehab of Louisiana | $ 11,920.00[137] |
| Advanced Surgical Care of Baton Rouge | $ 44,696.90[138] |
| Louisiana Institute of Physical Medicine | $ 2,938.00[139] |
| Our Lady of the Lake Physicians Group | $ 1,126.00[140] |
| Elite Chiropractic | $ 4,541.00[141] |
| Baton Rouge Orthopaedic Clinic | $ 4,284.00[142] |
| Lake Surgery Center | $ 9,021.50[143] |
| Peak Performance Physical Therapy | $ 8,744.00[144] |
| **TOTAL** = | $ 103,924.45 |

68.    Prine's medical expenses were paid, in whole or in part, by a health insurance issuer to a contracted medical provider.[145] The evidence presented at trial suggests that

---

[133] Pl. Ex. 15, pp. 1–4.
[134] *Id.* at pp. 5–9.
[135] *Id.* at pp. 10–14.
[136] *Id.* at pp. 15–16.
[137] *Id.* at pp. 17–21.
[138] *Id.* at pp. 22–25.
[139] *Id.* at pp. 26–27.
[140] *Id.* at pp. 28–33.
[141] *Id.* at pp. 34–37.
[142] *Id.* at pp. 38–40.
[143] *Id.* at pp. 41–42.
[144] *Id.* at pp. 43–55.
[145] *See* Pl. Ex. 15.

the following amounts were what was actually paid by Prine or still owed to the following providers:

| | | |
|---|---|---|
| Baton Rouge General | $ | 3,177[146] |
| Moreau Physical Therapy | $ | 988.05[147] |
| Imaging Center of Louisiana | $ | unknown[148] |
| Bone & Joint Clinic of Baton Rouge | $ | 281.17[149] |
| Interventional Spine & Rehab of Louisiana | $ | 2,044.68[150] |
| Advanced Surgical Care of Baton Rouge | $ | 2,803.02[151] |
| Louisiana Institute of Physical Medicine | $ | 2938.10[152] |
| Our Lady of the Lake Physicians Group | $ | 554.39[153] |
| Elite Chiropractic | $ | unknown[154] |
| Baton Rouge Orthopaedic Clinic | $ | 1912.83[155] |
| Lake Surgery Center | $ | 3,864.75[156] |
| Peak Performance Physical Therapy | $ | 2,732.25[157] |
| **TOTAL =** | $ | 21,296.24 |

---

[146] *Id.* at pp. 1–4.
[147] *Id.* at pp. 5–9.
[148] *Id.* at pp. 10–14.
[149] *Id.* at pp. 15–16.
[150] *Id.* at pp. 17–21.
[151] *Id.* at pp. 22–25.
[152] *Id.* at pp. 26–27.
[153] *Id.* at pp. 28–33.
[154] *Id.* at pp. 34–37.
[155] *Id.* at pp. 38–40.
[156] *Id.* at pp. 41–42.
[157] *Id.* at pp. 43–55.

### D. Medical Causation

69.   On July 10, 2025, Dr. John testified via trial deposition that the cervical spine pain and right trapezius pain and symptoms Prine suffered and continues to suffer are more likely than not caused by the collision.[158]

70.   Dr. John also testified that the medical treatment he provided to Prine was more likely than not made necessary by the collision.[159]

71.   On July 7, 2025, Dr. Rodriguez testified via trial deposition that the cause of Prine's right shoulder pain and symptoms is linked to the collision.[160]

72.   On July 21, 2025, Dr. Harrod testified via trial deposition that Prine has mild degenerative disc disease in her cervical spine but that it is not severe.[161] He further testified that the collision possibly aggravated Prine's pre-existing degenerative disc disease but that her cervical complaints are more likely than not related to the collision.[162]

73.   Dr. Harrod noted in his examination of Prine that her range of motion in the bilateral shoulder was "full and painless." When asked about this note in his trial deposition, he explained that though he is an orthopedist, he does not "do any shoulder surgery, period." His examination of Prine "was focused primarily with regards to the spine." He "wasn't going through a full shoulder exam."[163]

---

[158] Pl. Ex. 9, p. 24.
[159] *Id.* at p. 25.
[160] Pl. Ex. 12, pp. 21–22, 45–46.
[161] Def. Ex. 30, 24:38–25:19.
[162] *Id.* at 25:50–26:22, 28:09–28:20.
[163] *Id.* at 22:05–24:39.

74.    On August 4, 2025, Dr. Najeeb Thomas ("Dr. Thomas") testified via trial deposition that Prine has a pre-existing degenerative disc disease in her cervical spine. In his opinion, Prine's alleged injuries are an aggravation of a pre-existing condition.[164]

75.    On August 11, 2025, Dr. Scott Buhler ("Dr. Buhler") testified via trial deposition that Prine's right shoulder injury was not causally related to the collision. In his opinion, Prine did not have a substantial injury to the right shoulder at the time of the accident. Rather, she "has an anatomical variant, had multidirectional instability—subtle for years—and it presented itself overtime.[165]

76.    Dr. Buhler also testified that it is possible for a patient with a torn right labrum to have full range of motion and pain only with certain activities.[166]

77.    Dr. Thomas and Dr. Buhler are not Prine's treating physicians. They each performed independent reviews of Prine's medical records for purposes of this litigation. Neither doctor did an independent medical examination of Prine.[167]

### E.  Future Medical Expenses

78.    Dr. John testified that he has recommended a repeated cervical and occipital nerve radiofrequency ablation.[168]

79.    Dr. John further testified that after Prine undergoes that radiofrequency ablation, the nerves will eventually regenerate and cause a return in pain. In Dr. John's experience, his patients' relief from radiofrequency ablations typically lasts a year to a year and a half. Prine will, therefore, require future radiofrequency ablations.[169]

---

[164] Def. Ex 31-Part 1, 6:50–8:20.
[165] Def. Ex. 32, 24:15–24:26, 34:15–34:38.
[166] *Id.* at 13:58–14:28.
[167] Def. Ex. 31-Part 1, 2:56–3:02; Def. Ex. 32, 11:38–11:54.
[168] Pl. Ex. 9, p. 24.
[169] *Id.* at pp. 23–24.

80.    Dr. John estimates that future radiofrequency ablations will cost at least $9,000 each.[170]

81.    Dr. Thomas testified that in his opinion, Prine does not need any future medical treatment related to her alleged cervical spine injury.[171]

82.    Dr. Buhler testified that Prine should not need future medical treatment for her right shoulder, as long as she remains stable.[172]

### F.  Causation of Future Medical Treatment

83.    Dr. John testified that the future cervical and occipital nerve radiofrequency ablations he recommends are more likely than not made necessary by the collision.[173]

### G.  Life Before and After the Collision

84.    Before the collision, Prine was "able to do anything, just whatever she felt like doing. Active, free to do whatever; no limitations."[174]

85.    Prine rarely went to the doctor prior to the collision, other than for primary checkups and OBGYN visits.[175] She had never seen a chiropractor,[176] seen a neck and back doctor,[177]  gone to physical therapy,[178] had an MRI,[179] had ESI injections,[180] had medial branch blocks,[181] or had injections in her right shoulder[182] or neck.[183]

---

[170] *Id.* at p. 27.
[171] Def. Ex 31-Part 1, 8:20–9:30.
[172] Def. Ex. 32, 35:02–35:10.
[173] Pl. Ex. 9, p. 25, lines 6–11.
[174] Trial Transcript, p. 106, lines 11–14.
[175] *Id.* at p. 66, lines 3–6.
[176] *Id.* at p. 38, line 25; p. 39, lines 1–2.
[177] *Id.* at p. 23, lines 5–7.
[178] *Id.* at p. 24, lines 8–14.
[179] *Id.* at p. 25, lines 3–4.
[180] *Id.* at p. 30, lines 2–4.
[181] *Id.* at p. 33, lines 5–6.
[182] *Id.* at p. 42, lines 1–11.
[183] *Id.* at p. 22, lines 23–25.

86.    Prine was "a pretty adventurous person." She went indoor skydiving; rode water slides; rode rides at theme parks, including rollercoasters; and went white water rafting. She can no longer do those activities.[184]

87.    Prine cannot do the same activities around her home that she could before the collision. What she can do depends on what her workload at work is like for that week. She used to sweep her floor every other day but can now only sweep it maybe once a week. She likewise cannot wash her car and has trouble giving her dog a bath. She testified that "even scrubbing my bathtub is a challenge."[185]

88.    The collision has also affected Prine's work life. She has trouble lifting heavy things "like putting up inventory." This in turn has affected her focus at work. She testified that

> where I work now, there are little children. Little children come in, and they're bleeding out. Okay. I should be thinking solely about this child and their life, but I have to think "Can I pick this cooler of blood up to give it to them?" and "How's it going to affect me tomorrow how many coolers I have to pick up to put out to save this kid's life?" and I feel like I shouldn't have to think about that. I should be thinking about my patient only instead of having to think about myself and my injuries.[186]

89.    Prine also testified at length about how the collision affected her relationship with her now husband, Jones. She explained that in the past three and a half year, she has not slept completely through a whole night. Her persistent pain makes her irritable. Her pain has also caused her to not want to do things.[187]

90.    Prine also worries about the future of her career. As she explained in her testimony,

---

[184] *Id.* at p. 61, lines 17–21.
[185] *Id.* at p. 61, lines 24–25; p. 62, lines 1–3; p. 65, line 3.
[186] *Id.* at p. 65, lines 6–24.
[187] *Id.* at p. 66, lines 15–25; p. 67, lines 1–3.

I worry, did I go to college and have this career that I may not be able to do in the future because I have to look in a microscope constantly or I have to push blood at a blood bank? Am I going to be able to do that long-term? I've had my doctors tell me that, you know, "discs in your neck, they don't heal. They're bulging now. Maybe not today, maybe not tomorrow, but eventually they will herniate." So I worry about how that is going to affect my life and my career long-term.[188]

## H. Lost Wages

91.     Prior to the accident, Prine worked four, ten-hour days per week. Her shifts were from 10:30 a.m. to 9:00 p.m. She received additional pay for working past 3:00 p.m. Prine would earn an additional $2.75 per hour for the hours of 3:00 p.m. to 9:00 p.m., equating to an extra $16.50 per day.[189]

92.     At the time of the accident, Prine's wage at NorthOaks was $23.88 an hour.[190]

93.     By July of 2022, Prine's wage increased to $24.88 an hour.[191]

94.     By November 22, 2022, Prine's wage increased to $25.63 an hour.[192]

95.     Prine worked at NorthOaks until August of 2023. At that time, her wage had increased to $27.13 per hour.[193]

96.     Prine was terminated from NorthOaks because she exceeded the hospital's 12-day absence policy. For every unscheduled absence, an employee receives a "point." Prine testified that "after 12 [points] you are terminated. It doesn't matter if it's a doctor's excuse. It doesn't matter."[194]

97.     Prine had 14 points between the time of the collision to her termination date.[195]

---

[188] *Id.* at p. 67, lines 13–23.
[189] *Id.* at p. 73, lines 5–25; p. 74, lines 1–5.
[190] *Id.* at p. 56, lines 1–16.
[191] *Id.* at p. 56, lines 17–18.
[192] *Id.* at p. 57, lines 6–7.
[193] *Id.* at p. 57, line 9.
[194] *Id.* at p. 57, lines 10–18.
[195] *Id.* at p. 57, line 10; p. 58, line 6.

98.    Some of the 14 days missed were not related to the collision. Prine testified that she "missed a little bit of time from [a] fibroid surgery, but [she] was on family medical leave during that time, so that did not count against [her] as far as the points go. And then [she] missed a few days from having a miscarriage as well."[196]

99.    Of the 14 days missed, Prine used seven days of unpaid leave. That equates to $1,835 in wages.[197]

100.    Prine applied to work at three local hospitals throughout the fall of 2023. She was unable to secure employment.[198]

101.    Prine was unemployed from January 9, 2024, until her right shoulder posterior labral repair on April 25, 2024. When asked why she was unemployed during this time, Prine testified to the following:

> After I got terminated from NorthOaks, I started putting in some job applications, but then my shoulder was in so much pain that I was worried about having to go to work like that. And then once I saw Dr. Rodriguez initially and he told me that I would probably have to have surgery on my shoulder, I didn't want to start a new job and then have to tell them "hey, I need to take off to have surgery." [199]

102.    Dr. Rodriguez released her to go back to work after her right shoulder surgery on July 22, 2024.[200]

103.    Prine secured employment at Children's Hospital two weeks later.[201]

---

[196] *Id.* at p. 57, lines 19–24.
[197] *Id.* at p. 58, lines 21–25; p. 59, lines 1–4.
[198] *Id.* at p. 59, lines 20–25.
[199] *Id.* at p. 59, lines 5–25.
[200] *Id.* at p. 60, lines 1–13.
[201] *Id.* at p. 60, lines 17–21.

### III.   CONCLUSIONS OF LAW

#### A.  Applicable Law

104.   The Court has jurisdiction over this matter because the parties are diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs.[202]

105.   Louisiana substantive tort law applies in this case.[203]

106.   Prine bears the burden of proving fault, causation, and damages by a preponderance of the evidence.[204] Defendants have stipulated to fault. Thus, the only issues before the Court are causation and damages.

#### B.  Causation

107.   To prove causation, Prine must prove, through medical and lay testimony, that it was more likely than not that her injuries were caused by the collision.[205]

108.    A plaintiff with a preexisting condition may still be "entitled to compensation if the negligent act aggravated that condition. A causal link must be established between the negligent act and the degree of aggravation."[206]

109.   When a "defendant's negligent action aggravates a pre-existing injury, [s]he must compensate the victim for the full extent of the aggravation.[207]

110.   However, if a plaintiff can show that she was in good health prior to the collision and symptoms appeared thereafter, it is presumed that her injuries resulted from the collision, provided that medical evidence demonstrates "a reasonable

---

[202] 28 U.S.C. § 1332.
[203] *Id. See also Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).
[204] *Wainwright v. Fontenot*, 2000-0492 (La. 10/17/00); 774 So. 2d 70, 77.
[205] *Creel v. S.A. Tarver & Son Tractor Co.*, 537 So. 2d 752 (La. Ct. App. 1 Cir. 1988) (citing *Mart v. Hill*, 505 So. 2d 1120 (La. 1987)).
[206] *White v. State Farm Mut. Auto. Ins. Co.*, 97-1704 (La. Ct. App. 3 Cir 4/29/98); 713 So. 2d 618, 622 (internal citations omitted).
[207] *Perniciaro v. Brinch*, 384 So. 2d 392, 396 (La. 1980).

possibility of causal connection between the accident and the disabling condition."[208]

111.    Prine's treating physicians' diagnoses and opinions are given greater weight than doctors who examined her for purposes of this litigation.[209] The Court credits the opinions of Prine's treating physicians Dr. John, Dr. Rodriguez, and Dr. Harrod over those of Dr. Thomas and Dr. Buhler.

112.    The Court finds the opinions of Dr. John, Dr. Rodriguez, and Dr. Harrod well supported by the supporting medical records.

113.    Considering the medical testimony of Dr. John, Dr. Rodriguez, and Dr. Harrod and the fact that Prine was in good health prior to the collision and that her symptoms manifested after the collision, Prine's pain and suffering was caused by the collision.

114.    The Court finds that the medical treatment Prine received from the following healthcare providers was a result of, caused by, and made necessary by the collision:

- Baton Rouge General

- Dr. Thad Broussard

- Moreau Physical Therapy

- Imaging Center of Louisiana

- Bone & Joint Clinic of Baton Rouge

---

[208] *Housley v. Cerise*, 579 So. 2d 973, 980 (La. 1991). The Court notes 2025 La. Acts 18, which legislatively overrules the *Housley* presumption through implementing La. Code of Evid. art 306.1. However, "[t]he provisions of this Act shall have prospective application only and shall not apply to causes of action arising prior to the effective date of this Act[,]" which was May 28, 2025. *See* 2025 La. Acts 18.
[209] *Singleton v. United States*, No. 19-2684, 2021 WL 765384, at *7 (E.D. La. Feb. 26, 2021) (citing *Schouest v. J. Ray McDermott & Co.*, 411 So. 2d 1042, 1044 (La. 1982)).

- Interventional Spine & Rehab of Louisiana

- Advanced Surgical Care of Baton Rouge

- Louisiana Institute of Physical Medicine

- Our Lady of the Lake Physicians Group

- Elite Chiropractic

- Baton Rouge Orthopaedic Clinic

- Lake Surgery Center

- Peak Performance Physical Therapy

### C. Special Damages

115.    Under Louisiana Civil Code article 2315, "[e]very act of man that causes damage to another obliges him by whose fault it happened to repair it."[210] "In the delictual context, La. C.C. art. 2315 authorizes compensatory damages."[211] "Compensatory damages encompass those damages 'designed to place the plaintiff in the position in which [s]he would have been if the tort had not been committed.'"[212]

116.    "Compensatory damages are further divided into the broad categories of special damages and general damages."[213] "Special damages are those which have a 'ready market value,' such that the amount of the damages theoretically may be determined with relative certainty, including medical expenses and lost wages, while general damages are inherently speculative and cannot be calculated with mathematical certainty."[214]

---

[210] La. Civ. Code. art. 2315(A).
[211] *McGee v. A C And S, Inc.*, 2005-1036 (La. 7/10/06); 933 So. 2d 770, 773–74.
[212] *Id.* at 774.
[213] *Id.*
[214] *Id.*

117.  "A plaintiff may ordinarily recover reasonable medical expenses, past and future, which [s]he incurs as a result of the injury."[215] The plaintiff must prove it is more likely than not that the medical treatment was necessitated by the injury.[216]

118.  "When a plaintiff alleges [s]he incurred medical expenses and that allegation is supported by a bill, unless there is sufficient contradictory evidence or reasonable suspicion that the bill is unrelated to the accident, it is sufficient to support the inclusion of the item in the judgment."[217]

119.  Under La. R.S. 9:2800.27 (2022):

> B. In cases where a claimant's medical expenses have been paid, in whole or in part, by a health insurance issuer or Medicare to a contracted medical provider, the claimant's recovery of medical expenses is limited to the amount actually paid to the contracted medical provider by the health insurance issuer or Medicare, and any applicable cost sharing amounts paid or owed by the claimant, and not the amount billed. The court shall award to the claimant forty percent of the difference between the amount billed and the amount actually paid to the contracted medical provider by a health insurance issuer or Medicare in consideration of the claimant's cost of procurement, provided that this amount shall be reduced if the defendant proves that the recovery of the cost of procurement would make the award unreasonable. The determination of this award shall be made only in accordance with the provisions of Subsection F of this Section.

> ***

> F. In a jury trial, only after a jury verdict is rendered may the court receive evidence related to the limitations of

---

[215] *Rhodes v. State Through Dept. of Transp. And Development*, 94-1758 (La. Ct. App. 1 Cir. 12/20/96); 684 So. 2d 1134, 1148.
[216] *Id.*
[217] *Id.*

recoverable past medical expenses provided by Subsection B or D of this Section. The jury shall be informed only of the amount billed by a medical provider for medical treatment. Whether any person, health insurance issuer, or Medicare has paid or has agreed to pay, in whole or in part, any of a claimant's medical expenses, shall not be disclosed to the jury. In trial to the court alone, the court may consider such evidence.[218]

120.    Considering the calculation for past medical expenses prescribed in La. R.S. 9:2800.27 (2022), Prine suffered $54,347.52 in past medical expenses, which is the amount actually paid, plus 40% of the difference between what was billed and what was paid.

121.    "An award for future medical expenses is in great measure highly speculative and is not susceptible of calculation with mathematical certainty."[219] "However, like any other element of damage, future medical expenses must be established with some degree of certainty."[220] "An award for future medical expenses will not be supported in the absence of medical testimony that they are indicated and setting out their probable cost."[221]

122.    Considering Prine's age and Dr. John's testimony that Prine will need future radiofrequency ablations, relief from each radiofrequency ablation typically last for a year to a year and a half, and each radiofrequency ablation would cost approximately $9,000, the Court awards $63,000 in future medical expenses.

---

[218] The Court notes that this statute was recently amended but that its amendment applies prospectively, not retroactively. *See* 2025 La. Acts 466. Thus, the August 1, 2022 to December 31, 2025 version of the statute applies.
[219] *Rhodes*, 684 So. 2d at 1148.
[220] *Id.*
[221] *Id.*

123.    "In order to recover for actual wage loss, a plaintiff must prove that [s]he would have been earning wages, but for the accident in question."[222] "In other words, it is the plaintiff's burden to prove past lost earnings and the length of time missed from work due to the accident."[223] "Past lost earnings are susceptible of mathematical calculation from proof offered at trial and requires such proof as reasonably establishes the claim."[224] This proof may consist of the plaintiff's own testimony."[225]

124.    The Court finds that Prine suffered $1,835 in lost wages for the seven days of unpaid leave she took at NorthOaks in relation to the collision.

125.    Prine also suffered lost wages in relation to her right shoulder injury. Between January 9, 2024, through her April 25, 2024 shoulder surgery, Prine missed 77 workdays. Missing 77 workdays (10 hr. days) at $27.23 per hour equates to $20,967.10. Considering also the $16.50 per day evening differential, Prine suffered $22,237.60 in lost wages during this time.

126.    The Court further finds that Prine suffered lost wages during the period of recovery from the right shoulder surgery. She was unable to perform work duties until Dr. Rodriguez released her to work on July 22, 2024. In total, she missed 62 workdays. Missing 62 workdays (10 hr. days) at $27.23 per hour equates to $16.820.06. Considering also the $16.50 per day evening differential, Prine suffered $17,905.60 in lost wages during this time of surgery recovery.

127.    In total, Prine suffered $41,978.20 in lost wages.

---

[222] *Id*. at 1147.
[223] *Id*.
[224] *Id*.
[225] *Id*.

### D.  General Damages

128.    General damages are "those which may not be fixed with any degree of pecuniary exactitude but which, instead, involve mental or physical pain or suffering, inconvenience, the loss of gratification of intellectual or physical enjoyment, or other losses of life or life-style which cannot be really measured definitively in terms of money."[226]

129.    "[L]oss of enjoyment of life is a component of general damages and therefore loss of enjoyment of life is not separate and distinct from general damages."[227] "Nevertheless, general damages in Louisiana are routinely dissected."[228] "Courts commonly list different elements of general damages, including mental anguish and physical pain and suffering, both past and future, separately."[229]

130.    In the June 2023 case of *Ubas v. Slayton, et al.*, a Livingston Parish jury awarded $500,000 in general damages to a 34-year-old woman injured in an automobile accident. Plaintiff suffered a lumbar disc bulge that impinged on facet joints. She underwent three steroid injections, one medial branch block, one radiofrequency ablation, and was in the process of scheduling a second radiofrequency ablation. She had also undergone three years of chiropractic care. The jury awarded $200,000 for pain and suffering, $150,000 for loss of enjoyment of life, and $150,000 for mental anxiety/emotional distress.[230]

---

[226] *McGee v. A C And S, Inc.*, 933 So. 2d at 774 (quoting and citing *Duncan v. Kansas City S. R.R.,* 00–0066, p. 13 (La.10/30/00); 773 So. 2d 670, 682; *Boswell v. Roy O. Martin Lumber Co., Inc.,* 363 So. 2d 506, 507 (La. 1978); *Anderson v. Welding Testing Lab., Inc.,* 304 So. 2d 351, 352 (La. 1974)).
[227] *Id.*
[228] *Id.*
[229] *Id.* at 774–45 (citing *Joseph v. Broussard Rice Mill, Inc.,* 00–0628, p. 1 (La.10/30/00); 772 So. 2d 94, 106–107, n.6; *Degruise v. Houma Courier Newspaper Corp.,* 95–1862, p. 9 (La.11/25/96), 683 So. 2d 689, 694).
[230]  *See Ubas v. Slayton, et al.*, 2023 La Jury Verdicts & Sett. Lexis 28, 14 LaJVR 6.

131.   In the August 2024 case of *Ory v. Smith*, the Louisiana First Circuit Court of Appeal upheld a $800,000 general damage award for a 75-year-old woman who suffered physical decline following an automobile accident. Plaintiff suffered spinal injuries that required radiofrequency ablations. She also suffered a wrist injury that required a ligament reconstruction tendon interposition. The trial court awarded $400,000 in past physical pain and suffering, $200,000 in future physical pain and suffering, $100,000 in loss of enjoyment of life, and $100,000 in future mental anguish.[231]

132.   In the July 2023 case of *Rougeau v. Hospital Services District No. 2 of Beauregard Parish*, the Louisiana Third Circuit Court of Appeal upheld a trial court JNOV general damages award of $261,000 to a woman with a torn labrum requiring surgery. The award consisted of $160,000 in past pain and suffering, $25,000 in future pain and suffering, and $36,000 in loss of enjoyment of life.[232]

133.   Based on the foregoing general damages awards and the facts and circumstances of this case, the Court finds that a fair and adequate award for Prine's general damages is $700,000. This award consists of $500,000 in past and future pain and suffering, $100,000 in past and future mental anguish, and $100,000 in loss of enjoyment of life.

### E.  Summary of Damage Award

134.   In sum, the Court finds that Prine's injuries and attendant treatment and losses were caused by the December 28, 2021 collision and that Prine suffered the

---

[231] *Ory v. Smith*, 2023-0856 (La. Ct. App. 1 Cir. 8/8/24); 394 So. 3d 288.
[232] *Rougeau v. Hosp. Serv. Dist. No. 2 of Beauregard Par.*, 22-749 (La. Ct. App. 3 Cir 7/26/23), 368 So. 3d 1196.

following damages as a result Defendants' fault:

| | | |
|---|---|---|
| Pain and Suffering (Past and Future) | $ | 500,000.00 |
| Mental Anguish (Past and Future) | $ | 100,000.00 |
| Loss of Enjoyment of Life | $ | 100,000.00 |
| Past Medical Expenses | $ | 54,347.52 |
| Future Medical Expenses | $ | 63,000.00 |
| Past Lost Wages | $ | 41,978.20 |
| **TOTAL** = | $ | 859,325.72 |

## IV.    CONCLUSION

For the foregoing reasons, judgment will be entered in favor of Plaintiff Jennifer Prine and against Defendants Loxdon Insurance Company Inc., A Risk Retention Group, Global Transportation LLC, and Bekiev Maksat, in solido, in the sum of $859,325.72, with legal interest thereon from date of judicial demand until paid and for all costs of these proceedings. Plaintiff Jennifer Prine shall be entitled to costs upon application in accordance with M.D. La. Civ. R. 54(a), (c), including expert witness fees for the doctors who testified by deposition.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 13th day of February, 2026.

_____
**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**